David S. Stellings (*pro hac vice* to be filed)
Jason L. Lichtman (*pro hac vice* to be filed)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
dstellings@lchb.com
jlichtman@lchb.com

Fabrice Vincent (State Bar No. 160780)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
fvincent@lchb.com

*Attorneys for Plaintiff*
(additional counsel appear on signature page)

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| FERNANDO AVILES, BARRY KIERY, MICHAEL KELDER, and JAMES COWEN, individually and on behalf of all others similarly situated;<br><br>Plaintiff,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>Defendant. | Case No. 8:17-CV-00281<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1338964.4

1    Plaintiffs Fernando Aviles, Barry Kiery, Michael Kelder, and James Cowen

2    ("Plaintiffs"), individually and on behalf of the other members of the below-defined

3    nationwide class and statewide classes they respectively seek to represent

4    (collectively, the "Class"), hereby allege against Ford Motor Company

5    ("Defendant" or "Ford"), upon personal knowledge as to themselves and their own

6    acts, and as to all other matters upon information and belief, based upon the

7    investigation made by the undersigned attorneys, as follows:

8    **I.    <u>NATURE OF THE CASE</u>**

9    1.    Plaintiffs bring this class action seeking redress from Ford on behalf of

10   themselves and the other Class members, each of whom purchased or leased one of

11   the following Ford model vehicles containing a Delphi Sixth Generation ("Delphi

12   Gen 6") electronic throttle body ("ETB"): model years 2011 to 2015 Mustang with

13   3.7L TiVCT engines; model years 2011 to 2015 Edge with 3.5L TiVCT and 3.7L

14   TiVCT engines; model years 2011 to 2015 Lincoln MKX with 3.7L TiVCT

15   engines; model years 2011 to 2015 F-150 with 3.5L TiCVT and 3.7L TiVCT

16   engines (the "Class Vehicles").

17   2.    A throttle body is a component in fuel-injected engines that controls

18   the amount of air sent to the engine in response to the driver's compression or

19   release of the accelerator.  A throttle body includes a throttle plate, which is a

20   butterfly valve that flips open or closed to regulate the amount of air flowing to the

21   engine.

22   3.    In older cars, the driver's compression of the accelerator pedal was

23   communicated by throttle cable which physically pulled the throttle plate open and

24   closed.  In vehicles with electronic throttle bodies, including the Delphi Gen 6

25   ETBs at issue in this case, the accelerator pedal communicates through the vehicles'

26   computer systems to adjust the throttle plate through the use of electronic motors.

27   4.    In 2009, Ford began to equip its vehicles with Delphi Gen 6 ETBs.

28   Since that time, various Ford models, including the Class Vehicles, have

1    experienced a rash of potentially disastrous throttle body failures.

2         5.    Owners of Ford vehicles equipped with Delphi Gen 6 ETBs frequently

3    complain that their vehicles spontaneously stall or suddenly decelerate to a near idle

4    speed.  These abrupt deceleration incidents often cause near accidents or life-

5    threatening situations, such as when the incidents occur while driving in a highway

6    passing lane or congested traffic where navigating a disabled vehicle to a shoulder

7    or different lane can be extremely dangerous.  The problem frequently manifests at

8    highway speeds.

9         6.    The spontaneous stalling and sudden deceleration of the Class

10   Vehicles results from a defect within the Delphi Gen 6 ETBs (the "Throttle

11   Defect").  Specifically, the DC motor component of the Delphi Gen 6 ETB tends to

12   lose electrical connectivity because of the buildup of non-conductive "resistance

13   materials."  When this loss of connectivity occurs, the Powertrain Control Module

14   within the Class Vehicles can no longer determine the position of the throttle.  In

15   response, the Powertrain Control Module immediately triggers Failure Mode

16   Effects Management, commonly known as "limp-home mode," which typically

17   restricts the vehicle's speed to a few miles per hour.  Even though the vehicles are

18   in "limp-home mode," most drivers interpret this as a stall and complete loss of

19   power.

20        7.    Plaintiffs are among the thousands of owners and lessees of the Class

21   Vehicles who reasonably expected that their vehicles' component parts, including

22   the ETB, would function properly, but instead were sold Class Vehicles equipped

23   with defective ETBs.  Scores of complaints documenting the effects of the Throttle

24   Defect have been submitted to the National Highway Traffic Safety Administration

25   ("NHTSA"), as well as other websites and Ford owner forums.  On information and

26   belief, these complaints represent a small fraction of the number of actual incidents

27   experienced by consumers.

28        8.    Purchasers who complain to Ford about the effects of the Throttle

Defect are frequently told by Ford service professionals that it is caused by a defective throttle body component.

9.      In January 2014, Ford instituted Customer Satisfaction Program 13N03 in response to a NHTSA investigation regarding identical safety complaints about a specific version of the Delphi Gen 6 ETB (part number DS7Z-9E926-A) that was installed in different Ford vehicles than the Class Vehicles.  At the conclusion of that investigation, Ford claimed to have discovered and resolved a defect with the throttle body in these vehicles.

10.     Ford, however, did not resolve the problems with the materially identical versions of the Delphi Gen 6 ETBs within the Class Vehicles.  Instead, Ford continued to sell a significant number of vehicles with defective ETBs that present enormous safety risks.

11.     For example, on June 25, 2016, the owner of a 2015 Ford Edge registered the following complaint with the NHTSA (ID Number: 10881852):

> ETB ELECTRONIC THROTTLE BODY FAILED WHILE
> DRIVING PUTTING ME IN DANGER ON THE ROAD AND
> CAUSING MY CAR TO GO LIMP. I WAS DRIVING 70 MPH IN A
> 75 AND LOST POWER AND CONTROL OF THE VEHICLE. IT
> WAS ALL I COULD DO TO PUT THE CAR ON THE SHOULDER
> WITHOUT AN ACCIDENT. THE WRENCH LIGHT CAME ON
> THE DASHBOARD. IT WAS TOWED TO TEXARKANA AND I
> AM IN ROCKWALL TX WAITING ON 15000 OF THESE PARTS
> ARE ON BACK ORDER WITH FORD TO COME IN FOR MY
> CAR. THIS IS HOPELESS. IT'S DANGEROUS TO HAVE THIS
> CAR STALL LIKE THAT AND TO KNOW 1.6 MILLION HAVE
> ALREADY.

12.     Upon information and belief, Ford has been aware of the problems with the Delphi Gen 6 ETB since at least as early as 2009.  Despite this knowledge,

1    Ford never disclosed the existence of the Throttle Defect and its potential

2    consequences to purchasers or owners of the Class Vehicles.  Instead, Ford

3    concealed and failed to disclose its knowledge of the Throttle Defect in the hope

4    that its limited warranty would expire before consumers became aware of this life-

5    threatening defect.

6          13.    Upon information and belief, the Class Vehicles all contain Delphi

7    Gen 6 ETBs with part numbers AT4Z-9E926-A or AT4Z-9E926-B.  Ford possesses

8    the information necessary to identify accurately all Class Vehicles that were

9    manufactured with the specific defective parts at issue.

10         14.    As a result of Ford's unfair, deceptive, and fraudulent business

11   practices, and its failure to disclose the Throttle Defect, owners and lessees of the

12   Class Vehicles have suffered losses in money and property.

13   **II.    <u>JURISDICTION AND VENUE</u>**

14         15.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C.

15   § 1332(d)(2) because the Plaintiffs and one or more of the other Class members are

16   citizens of a different state than Defendant, there are more than 100 class members

17   nationwide, and the aggregate claims of the Class exceed $5,000,000 exclusive of

18   costs and interest.

19         16.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C.

20   § 1331 because Plaintiffs present claims under the Magnuson-Moss Warranty Act,

21   15 U.S.C. §§ 2301, *et seq*.

22         17.    This Court has personal jurisdiction over Ford because Ford

23   purposefully availed itself of the privilege of conducting business in California by

24   advertising and selling its manufactured vehicles (including the Class Vehicles at

25   issue) within California.  Additionally, Ford has maintained systematic and

26   continuous business contacts within California (including with its authorized

27   dealers within California), and is registered to conduct business in the State.

28         18.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a

substantial part of the events and/or omissions giving rise to Plaintiffs' claims occurred within this District, and because Plaintiff Aviles is a resident of Buena Park, California, which is located in this District.

## III.   PARTIES

### A.   Plaintiffs

#### 1.   California

19.   Plaintiff Fernando Aviles is a citizen of California and a resident of Buena Park, California.  Mr. Aviles purchased a 2012 Mustang 3.7L TiVCT from Norm Reeves Ford in Cerritos, California on January 3, 2015.

20.   Before purchasing his Mustang, Mr. Aviles reviewed Ford's promotional materials regarding the vehicle and interacted with at least one sales representative at an authorized Ford dealership.

21.   Ford failed to disclose the Throttle Defect to Mr. Aviles before he purchased his Mustang, despite Ford's knowledge of the defect, and Mr. Aviles, therefore, purchased his Mustang with the incorrect understanding that it would be a safe and reliable vehicle.

#### 2.   Florida

22.   Plaintiff Barry Kiery is a citizen of Florida and a resident of Tampa, Florida.  Mr. Kiery purchased a 2012 Ford Mustang 3.7L TiVCT from Sarasota Ford in Sarasota, Florida on February 25, 2012.

23.   Before purchasing his Mustang, Mr. Kiery reviewed Ford's promotional materials regarding the vehicle and interacted with at least one sales representative at an authorized Ford dealership.

24.   Ford failed to disclose the Throttle Defect to Mr. Kiery before he purchased his Mustang, despite Ford's knowledge of the defect, and Mr. Kiery, therefore, purchased his Mustang with the incorrect understanding that it would be a safe and reliable vehicle.

25.   Plaintiff Michael Kelder is a citizen of Florida and a resident of

Bradenton, Florida.  Mr. Kelder purchased a 2014 Ford Mustang 3.7L TiVCT from Auto Nation Ford in Bradenton, Florida on December 23, 2013.

26.    Before purchasing his Mustang, Mr. Kelder reviewed Ford's promotional materials regarding the vehicle and interacted with at least one sales representative at an authorized Ford dealership.

27.    Ford failed to disclose the Throttle Defect to Mr. Kelder before he purchased his Mustang, despite Ford's knowledge of the defect, and Mr. Kelder, therefore, purchased his Mustang with the incorrect understanding that it would be a safe and reliable vehicle.

### 3.    Alabama

28.    Plaintiff James Cowen is a citizen of Alabama and resident of Opp, Alabama.  Mr. Cowen purchased a 2013 Ford F-150 3.5L TiVCT from Andalusia Ford in Andalusia, Alabama on January 15, 2016.

29.    Before purchasing his F-150, Mr. Cowen reviewed Ford's promotional materials regarding the vehicle and interacted with at least one sales representative at an authorized Ford dealership.

30.    Ford failed to disclose the Throttle Defect to Mr. Cowen before he purchased his F-150, despite Ford's knowledge of the defect, and Mr. Cowen, therefore, purchased his F-150 with the incorrect understanding that it would be a safe and reliable vehicle.

### B.    Defendant

31.    Defendant Ford Motor Company is a Delaware corporation with its principal place of business at One American Road in Dearborn, Michigan, 48126. Ford is in the business of designing, manufacturing, and distributing motor vehicles.  Its vehicles include those sold under the Ford, Lincoln, and Mercury brands.

## IV.    FACTS COMMON TO ALL COUNTS

### A.    The Throttle Defect

32.    The throttle body is the component in fuel injected engines that controls the amount of air sent to the engine in response to the driver's compression or release of the accelerator.  Throttle bodies include a throttle plate, which is a butterfly valve that flips open or closed to regulate the amount of air flowing to the engine.

33.    Starting with model year 2009, Ford equipped several models of its vehicles with Delphi Gen 6 electronic throttle bodies.  Unlike older throttle bodies that had throttle plates controlled by physical cables connected to the accelerator, electronic throttle bodies, including the Delphi Gen 6, have throttle plates that are opened and closed by small DC motors that are controlled by the vehicles' computerized electronic systems.

34.    Upon information and belief, the Delphi Gen 6 ETBs at issue in this case were manufactured by Delphi Automotive, a "leading global technology company" in the automotive market.  The Delphi Gen 6 ETBs installed in the Class Vehicles were defectively designed and are prone to sudden failure.  Specifically, components within the Delphi Gen 6 ETBs accumulate high-resistance deposits, which in turn cause the Delphi Gen 6 ETBS to lose electrical connectivity with the throttle position sensor of the vehicles in which they are installed.

35.    When a Class Vehicle's Powertrain Control Module detects this loss of electrical connectivity, it immediately converts the vehicle into what Ford refers to as "Failure Mode Effects Management" (more commonly known as "limp-home mode") which eliminates a driver's ability to control the speed of their vehicle.

36.    Class Vehicles may experience varying types of limp-home mode depending on the vehicle's interpretation of the throttle malfunction.  The Throttle Defect often manifests itself under Diagnostic Trouble Codes ("DTC") P2111 and P2112, which indicate the throttle is either stuck open or stuck closed, respectively.

37.     These particular DTCs indicate a severe malfunction, which causes the Class Vehicles to shift into Ford's most severe limp-home mode and restricts them to 900 RPM, which is practically idle.  While the Class Vehicles do not lose all power, owners often interpret a sudden shift from highway speeds to 900 RPM as a complete loss of power.

38.     The Class Vehicles are increasingly likely to experience the dangerous consequences of the Throttle Defect as they age because high resistance deposits in the Delphi Gen 6 ETB accumulate over time.  Upon information and belief, Ford vehicles containing Delphi Gen 6 ETBs with the part numbers AT4Z-9E926-A and AT4Z-9E926-B include the Throttle Defect.  These include the following Ford vehicles: model year 2011-2015 Mustangs with 3.7L TiVCT engines; model year 2011-2015 Edges with 3.5L TiVCT and 3.7L TiVCT engines; model year 2011-2015 Lincoln MKXs with 3.7L TiVCT engines; and model year 2011-2015 Ford F-150s with 3.5L TiVCT and 3.7L TiVCT engines.

**B.     The Throttle Defect Presents an Unreasonable Safety Risk**

39.     The Throttle Defect presents an unreasonable safety risk to Class Vehicle owners because it causes the Class Vehicles to spontaneously stall or suddenly decelerate to a near idle speed.  Sudden deceleration incidents are particularly dangerous in congested areas, and on busy highways, where motorists cannot easily pull over to the side of the road.  The Throttle Defect is particularly dangerous because it often occurs at highway speeds.

40.     On NHTSA's official complaint registry, available at www.safecar.gov,[1] there are hundreds of similar complaints documenting the Throttle Defect across the four Ford models at issue in this litigation.

41.     For example, on October 3, 2014, the owner of a 2011 Lincoln MKX

---

[1] All quotations of consumer comments posted on NHTSA and elsewhere are reproduced with spelling and grammatical errors as found in the original.  Portions appearing in bold have been modified for emphasis.

1  complained (ID Number: 10641097):

2         THIS IS THE THIRD OF THREE INCIDENTS WITH THIS

3         VEHICLE. ON THIS OCCASION I WAS TRAVELING 70 MPH IN

4         THE FAST LANE OF THE EXPRESSWAY, WHEN THE ENGINE

5         FAILED FOR THE THIRD TIME IN 1 YEAR. ON THIS

6         OCCASION THE WRENCH SYMBOL CAME ON THE

7         DASHBOARD. ACCORDING THE VEHICLE'S MANUAL THIS IS

8         AN INDICATION OF A POWERTRAIN PROBLEM. **THIS WAS**

9         **THE CLOSEST THAT I CAME TO HAVING AN ACCIDENT.**

10        **THERE WAS ONLY ABOUT 1000 FEET TO THE LEFT ON**

11        **THE FAST LANE TO STOP THE VEHICLE WITHOUT**

12        **HITTING THE GUARD RAIL**. THE VEHICLE HAS BEEN AT

13        THE DEALERSHIP FOR 5 DAYS. WE WERE CALLED THE DAY

14        AFTER WE DROPPED THE CAR OFF FOR SERVICING. AGAIN

15        THEY SAID THEY COULD NOT DUPLICATE THE PROBLEM

16        AND WANTED TO RETURN THE VEHICLE TO US WITHOUT

17        RESOLVING THE PROBLEM. I INFORMED LINCOLN THAT I

18        WOULD NOT TAKE THE CAR BACK UNTIL IT WAS SAFE TO

19        DRIVE. WE ARE CURRENTLY WORKING WITH LINCOLN TO

20        SEE WHAT CAN BE DONE. *TR

21        42.    On December 8, 2014, the owner of a 2013 Ford Edge complained (ID

22  Number: 1066221):

23        THIS HAS NOW HAPPENED TO ME THREE TIMES AND ALL

24        THREE TIMES WERE DURING RUSH HOUR TRAFFIC AND **I**

25        **WAS LUCKY TO NOT BE HIT FROM BEHIND**. I WILL BE

26        DRIVING AND I SUDDENLY GET A WRENCH LIGHT ON MY

27        DASH BOARD AND THEN LOSE THE ABILITY TO

28        ACCELERATE MY CAR AND IT BASICALLY COASTS TO A

1    STOP AND I CAN FEEL A SHAKING/RUMBLING FROM THE
2    ENGINE. WHEN I PUT THE CAR IN PARK AND TURN IT OFF, I
3    CAN TURN IT BACK ON AND IT IS LIKE NOTHING
4    HAPPENED AND THE LIGHT GOES AWAY AND I CAN
5    CONTINUE DRIVING HOME. I CALLED THE DEALER AND
6    THEY SAID THEY CAN ONLY FIX IT IF THEY SEE THE
7    WRENCH LIGHT ON SO THEY CAN PULL THE CODE,
8    MEANING I HAVE TO HAVE MY CAR TOWED TO THE
9    DEALER WHILE STILL ON. ONLY PROBLEM IS EVERY TIME
10   IT HAS HAPPENED HAS BEEN AFTER WORK AT NIGHT
11   WHEN THE DEALERS ARE ALREADY CLOSED. I **AM NOW**
12   **NERVOUS EVERY TIME I DRIVE THE CAR AND AM**
13   **AFRAID TO GET ON HIGHWAYS.** *TR

14   43.   The Throttle Defect also represents a clear safety risk while driving at
15   city speeds.  The defect often manifests when cars accelerate from a stop, as
16   indicated by a further record of complaints submitted to the NHTSA.

17   44.   On November 5, 2015, the owner of a 2011 Ford Mustang complained
18   (ID Number:  10788529):

19   CAR RANDOMLY GOES INTO "LIMP HOME" MODE. CODE
20   COULD NOT BE CAUGHT BY DEALER SO I PURCHASED A
21   SCANNER. CODE CAUGHT EVERYTIME IS P2111
22   REPRESENTING THAT THE THROTTLE BODY ACTUATOR IS
23   STUCK OPEN. THIS CAN HAPPEN WITHIN A FEW MILES OF
24   DRIVING OR UP TO 20 MILES. IT CAN HAPPEN AT 5 MPH OR
25   65 MPH. IT CAN HAPPEN WITHIN THE FIRST FEW MINUTES
26   OF A TRIP OR 30 MINUTES IN. IT CAN HAPPEN ONCE OR
27   EVERY FEW MINUTES. THIS IS VERY DANGEROUS AS THE
28   LIMP HOME DOES NOT GET ENOUGH POWER TO GET OFF

1    ROAD. I ALMOST CAUSED A MULTI CAR ACCIDENT. CAN

2    YOU IMAGINE DRIVING DOWN THE HIGHWAY AND THE

3    CAR JUST STOPS? IT DOESN'T EVEN COAST. I SEE THIS

4    COMPLAINT ON ALOT OF FORD FORUMS. IT IS LIKE FORD IS

5    JUST WAITING FOR SOMEONE TO BE KILLED OR SUE THEM

6    BEFORE THEY SOLVE THE ISSUE. I HAVE TAKEN IT TO THE

7    FORD DEALER AND THEY SAY IT IS MY BATTERY. I WENT

8    TO AN INDEPENDENT SOURCE AND THEY TESTED MY

9    BATTERY AND I HAD KNOWN, THE BATTERY IS FINE. I

10    HAVE BEEN INTO FORD SERVICE NUMEROUS TIMES AND

11    WHEN I RETURN THEY DO EVERTHING BUT FIX THE ISSUE.

12    THE DATE BELOW IS THE 1ST TIME EXPERIENCED. IT

13    DIDN'T HAPPEN OFTEN BUT THIS YEAR IS EVERYTIME I

14    DRIVE

15    45.    On November 11, 2015, the owner of a 2013 Ford Edge complained

16    (ID Number: 10789777):

17    WHEN DRIVING MY CAR THE ENGINE WILL GO TO IDLE

18    WITH NO WARNING. I CAN BE MAKING A TURN,

19    ACCELERATING, OR JUST CRUISING AT SPEED. THIS HAS

20    BEEN RECALLED ON MOST ALL OTHER FORD VEHICLES. I

21    COULD JUST GET IT REPLACED, BUT THE ISSUES IS NOT

22    ONLY THE THROTTLE BODY, ITS THE PROGRAMMING. IF IT

23    FINDS AN ISSUE WITH THE THROTTLE BODY IT GIVES UP,

24    AND STALLS. IN THE RECALLED FORDS WITH THIS THEY

25    HAVE CHANGED THE PROGRAMMING SO IT KEEPS TRYING

26    TO ACCELERATE, NOT JUST GIVE UP. WITH THAT BEING

27    SAID THERE IS NO POINT TO CHANGE IT, IT WILL ONLY

28    HAPPEN AGAIN AFTER I SPEND $1000 TO FIX IT. THIS IS

VERY DANGEROUS! THE FIRST TIME I WAS MAKING A LEFT IN TO TRAFFIC AND IT CUT OUT, LUCKY FOR EVERYONE THEY HAD ENOUGH TIME TO STOP BEFORE I GOT T-BONED MY 3 LANES OF  TRAFFIC. FORD WILL NOT RECTIFY THIS ISSUE UNTIL MORE PEOPLE DIE! PLEASE HELP WITH AN INVESTIGATION! CODES GIVEN BY OBD2 ARE P2111 AND P2112. AT THE SAME TIME. THANK YOU. *TR

### C.     The NHTSA Investigation

46.     The defective nature of certain Delphi Gen 6 ETBs was specifically brought to NHTSA's attention around August 30, 2012, when the North Carolina Consumers Council ("NCCC") petitioned the federal agency to initiate a defect investigation into throttle body failures resulting in engine stall or surge on 2005 through 2012 model year Ford Escapes.  The NCCC petition cited two complaints regarding 2009 Ford Escapes that were diagnosed with failed throttle bodies after showing DTC P2111, indicating Throttle Actuator Control System – Stuck Open, and DTC P2112, indicating Throttle Actuator Control System – Stuck Closed.

47.     On October 2, 2012, the NHTSA's Office of Defects Investigation ("ODI") opened Defect Petition DP12-006 to evaluate whether to investigate the issue.

48.     On February 28, 2014, the ODI closed its investigation and provided the following summary of its conclusions:

On February 21, 2013, the Office of Defects Investigations (ODI) opened Preliminary Evaluation PE13-003 to investigate allegations of electronic throttle body (ETB) failures resulting in sudden reduction of engine power in model year (MY) 2009-2013 Ford Escape, Fusion, Mariner and Milan vehicles. During this investigation, Ford identified a condition in subject vehicles equipped with 2.5L and 3.0L engines that may result in a sudden reduction of engine power. According to Ford, the ETB internal motor contacts may develop a high resistance material

buildup condition on the commutator, resulting in intermittent electrical connectivity and reduced engine power. When this condition occurs, the Malfunction Indicator Lamp (MIL) or Wrench light will illuminate and the vehicle may enter a limited limp home mode. Ford's trade name for the feature is Failure Mode Effects Management (FMEM) mode. In this mode, engine power and vehicle speed are reduced, while full function of the power steering, power braking, lighting, and climate control systems are maintained.

ODI's complaint analysis indicate that the predominant failure mode involved reduced motive power associated with the limited limp home mode with engine speeds limited to approximately 900 RPM. Analysis of warranty claims provided by Ford identified 59,807 claims related to ETB replacements and approximately 50 percent of claims are associated with diagnostic trouble codes (DTC) P2111, "Throttle Body Stuck Open," and P2112, "Throttle Body Stuck Closed". Ford described several factors where the ETB motor may fail resulting in DTCs P2111 or P2112 but the failure is not an existing stuck open or closed ETB valve position. According to Ford, the ETB control strategy provides the driver with three FMEM modes that allow varying degrees of vehicle mobility depending on the severity of the fault detected. DTCs associated with stuck open or closed throttle valves are designated the highest failure severity resulting in engine speeds limited to high idle corresponding to the limited limp home mode. Vehicles are not likely to unexpectedly stall as a result of this condition, but drivers may characterize the reduced functionality as a stall, even though their vehicle may still has [sic] motive capability. Other FMEM limp modes may result in reduced engine performance but will maintain vehicle speed above 20mph.

During this investigation, Ford and its suppliers, Delphi and Igarashi, updated the powertrain control module (PCM) software to include a throttle body motor cleaning cycle during key-on and modified the ETB internal motor components design, surface finish and material composition to improve durability.

Additionally, Ford developed a remedy procedure and issued a special Customer Satisfaction Program(CSP) 13N03 extending the ETB warranty coverage and instructing dealers to update the powertrain calibration to improve vehicle performance in the event that intermittent electrical connectivity of the throttle body motor contacts occurs. The program extends the coverage for up to 10 years of service or 150,000 miles from the warranty start date of the vehicle, all vehicles are eligible for the program through January 31, 2015 regardless of mileage. Owners of the affected vehicles will be contacted by mail to take their vehicle to a Ford dealer who will reprogram the PCM to the latest calibration. The bulletin was sent to dealers on January 17, 2014 and the owner letter mailing began on January 27, 2014. See the investigative file for copies of Ford's bulletin and owner letter.

This preliminary evaluation is closed. The closing of this investigation does not constitute a finding that a safety-related defect does not exist. For additional information regarding this investigation, see complete closing resume in the document file for PE13-003.

49.     PE13-003 found 11,960 unique reports of throttle failure in 2009-13 Ford Escape, Mariner, Fusion, and Milan vehicles, all of which originally contained Delphi Gen 6 ETBs with the part number DS7Z-9E926-A.

50.     In response to PE13-003, Ford issued Customer Satisfaction Program 13N03 ("CSP 13N03") to remedy only those vehicles covered by the government investigation.  Under this program, Ford agreed to: (1) extend the warranty on the vehicles' throttle bodies until 10 years or 150,000 miles; (2) reimburse those who already paid to replace the defective throttle bodies; and (3) update the Powertrain Control Module software.  Ford service locations were also instructed to replace the original throttle bodies (part number DS7Z-9E926-A) with replacement parts (part number DS7Z-9E926-D) when owners complained of throttle body failures.

51.     Dealers were notified of CSP 13N03 in the following communication:

**SUBJECT: Customer Satisfaction Program 13N03**

Certain 2009 Through 2013 Model Year Fusion, Milan, Escape and Mariner Vehicles

Throttle Body Extended Coverage

**PROGRAM TERMS**

This program extends the coverage of the Throttle Body to 10 years of service or 150,000 miles from the warranty start date of the vehicle, whichever occurs first. This is a <u>one-time</u> repair program. If a vehicle has already exceeded the time or mileage limits, this coverage will last through January 31, 2015. Coverage is automatically transferred to new owners.

**NOTE: This program applies to affected vehicles which are beyond the terms of the New Model Vehicle Warranty coverage**.

**VEHICLES COVERED BY THIS PROGRAM**

| Vehicle Lines | Model Years | Assembly Plant | Build Dates |
|---|---|---|---|
| Fusion and Milan | 2010-2013 | Hermosillo | Job #1 thru July 16, 2013 |
| Escape and Mariner | 2009-2012 | Kansas City | Job #1 thru April 29, 2012 |
| Escape | 2013 | Louisville | Job #1 thru June 2, 2013 |

Affected vehicles are identified in OASIS.

**REASON FOR PROVIDING ADDITIONAL COVERAGE**

Affected vehicles may develop contamination on the internal motor contacts of the Throttle Body, resulting in intermittent electrical connectivity. If this condition is present, the Malfunction Indicator Lamp (MIL) or Wrench light will illuminate and the vehicle may enter a Failure Mode Effects Management (FMEM) of default throttle position with fixed RPM. In this mode, engine power and vehicle

speed are reduced, while full function of the power steering, power braking, lighting, and climate control systems are maintained.

**SERVICE ACTION**

If dealer diagnosis of an engine warning lamp on an affected vehicle identifies the Throttle Body as the causal component, dealers are authorized to replace the Throttle Body under this program. This service must be performed at no charge to the vehicle owner.

**NOTE:** Dealers will be notified later this spring when an updated powertrain calibration is available for some affected vehicles, which will improve vehicle performance in the event that contamination of the Throttle Body motor contacts occurs.

**OWNER NOTIFICATION MAILING SCHEDULE**

Owner Letters are expected to be mailed the week of January 27, 2014. Dealers should repair any affected vehicles that exhibit the covered condition, whether or not the customer has received a letter.

**Customer Satisfaction Program 13N03**

Certain 2009 Through 2013 Model Year Fusion, Milan, Escape and Mariner Vehicles Throttle Body Extended Coverage

**OASIS ACTIVATED**?

Yes, OASIS will be activated on January 17, 2014.

**FSA VIN LIST ACTIVATED?**

No, FSA VIN list will not be activated for this service action.

**STOCK VEHICLES**

Do not perform this program unless the affected vehicle exhibits the covered condition.

**SOLD VEHICLES**

Only owners with affected vehicles that exhibit the covered condition will be directed to dealers for repairs.

### TITLE BRANDED / SALVAGED VEHICLES

Affected title branded and salvaged vehicles are eligible for this service action.

### RELATED DAMAGE

If a related damage condition exists that you believe to be caused by the covered condition, call the Special Service Support Center to request approval **prior** to the repair of any related damage. Requests for approval after completion of the repair will not be granted.

### ADDITIONAL LABOR TIME

- If a condition exists that requires additional labor to complete the repair, call the Special Service Support Center to request approval prior to performing any additional labor. Requests for approval after completion of the repair will not be granted.
- If you encounter aftermarket equipment or modifications to the vehicle which might prevent the repair of the covered condition, call the Special Service Support Center.

### OWNER REFUNDS

- Ford Motor Company is offering a refund for owner-paid repairs covered by this program if the repair was performed before the date of the Owner Notification Letter. This refund offer expires July 31, 2014.
- Dealers are also authorized to refund owner-paid emergency repairs that were performed away from an authorized servicing dealer after the date of the Owner Notification Letter. There is no expiration date for emergency repair refunds. Non-covered repairs, or those judged by Ford to be excessive, will not be reimbursed.

Refunds will only be provided for the cost associated with diagnosis and replacement of the Throttle Body.

### D.    CSP 13N03 Did Not Address the Class Vehicles

52.    CSP 13N03 only applied to those Ford vehicles equipped with the DS7Z-9E926 version of the Delphi Gen 6 ETB (the Fusion, Escape, Milan, Mariner models). It did not address, and did not provide relief to owners of, vehicles containing the AT4Z-9E926 version of the Delphi Gen 6 ETB, which was installed in the Class Vehicles at issue in this litigation.

53.    Upon information and belief, the DS7Z-9E926 and AT4Z-9E926 Delphi Gen 6 ETBs are materially similar components. Both parts share the same Ford base part number—"9E926"—but are otherwise designed to be placed in different Ford vehicles equipped with different engines.

54.    Upon information and belief, both the DS7Z-9E926 ETB, addressed by CSP 13N03, and the AT4Z-9E926 ETB, at issue in this litigation, contained similar or identical Igarashi DC motor components. Thus, when Ford issued CSP 13N03, it only addressed a subset of vehicles containing the know-to-be-defective Igarashi DC motor.

55.    Class Vehicles owners have consistently complained about being left out of Ford's customer satisfaction program, despite the fact that their vehicles contain a similar part that presents an identical safety concern.

56.    On September 23, 2015, the owner of a 2013 Ford Edge complained (ID Number: 10775456):

DRIVING FORD EDGE 2013 APPROX. 40 MPH ON HIGHWAY WHEN THE VEHICLE CAME TO ALMOST A DEAD STOP. IT SEEMED AS IF THE BRAKES BECAME FULLY ENGAGED OR THE TRANSMISSION SEIZED. **A TRUCK BEHIND US SWERVED AND BRAKED AND ALMOST CRASHED INTO US. MY 2 CHILDREN AND I WOULD HAVE BEEN KILLED.** THE VEHICLE SHOOK VIOLENTLY AS IT MOVED ABOUT 2 MPH. I BARELY WAS ABLE TO GET IT OVER TO THE RIGHT,

OFF THE HIGHWAY. IT WOULD NOT GO ANY FURTHER. A RED WRENCH ICON LIT ON THE DASH. I TOWED IT TO MIDWAY FORD. SERVICE MANAGER STATED THE THROTTLE BODY PART IS DEFECTIVE AND RECALLED, BUT RESETS ITSELF IF VEHICLE IS TURNED OFF FOR A WHILE, SO IF I DID NOT TURN OFF THE VEHICLE, FORD WOULD FIX IT FOR FREE. SINCE I TURNED OFF THE VEHICLE AND IT RESET, I HAD TO PAY HIM $900 TO REPLACE IT. **SINCE I DID NOT HAVE $900, HE ADVISED ME TO DRIVE THE VEHICLE VERY SLOWLY ON THE RIGHT SIDE OF THE ROAD FROM NOW ON, AS A PRECAUTION SO MY CHILDREN OR I DO NOT GET INJURED OR KILLED THE NEXT TIME IT HAPPENS.** IF THIS IS FORD'S CRITERIA FOR REPLACING THIS LIFE THREATENING DEFECTIVE PART, THAT IT MUST BE IN ACTIVE DEFECT STATUS WHEN ARRIVING AT THE DEALER, THEN NOT ONLY HAS FORD HAS FOUND A WAY TO BEAT PAYING FOR THE 1.6 MILLION VEHICLES THEY AGREED TO RECALL WITH THIS DEFECT, SINCE YOU CAN'T DRIVE THE VEHICLE AT 900 RPM TO THE DEALER, OR TOW IT WHILE RUNNING, **BUT FORD IS GETTING RICH OFF THE RECALL (THE PART IS ABOUT $185 AND TAKES 15 MINUTES TO REPLACE), AND 1.6 MILLION PEOPLE MUST PAY FORD $900 TO FIX A RECALLED DEFECTIVE PART.**

57.    On August 27, 2014, the owner of a 2011 Ford Mustang complained (ID Number: 10628802):

DEFECTIVE ELECTRONIC THROTTLE BODY (ETB) AS PER DEALERSHIP DIAGNOSIS. **FORD CUSTOMER SERVICE IS EXCLUDING MUSTANGS FROM THE CUSTOMER**

1    **SATISFACTION PROGRAM 13N03 - WHICH CLEARLY**

2    **STATES THERE IS A PROBLEM WITH ETBS DURING THIS**

3    **TIME**. LOOKING OVER THE INTERNET, IT IS CLEAR THAT

4    SOME MUSTANGS WHERE BUILT WITH THE SAME TYPE OF

5    ETB AS THE MODELS COVERED UNDER THE PROGRAM

6    (FUSION, ESCAPE, MERCURY MARINER AND MERCURY

7    MILAN). THE PROGRAM EXTENDS THE WARRANTY ON THE

8    THROTTLE BODY TO A TOTAL OF 10 YEARS OR 150,000

9    MILES FROM THE WARRANTY START DATE, WHICH EVER

10    OCCURS FIRST. THIS CAR IS EXTREMELY DANGEROUS TO

11    DRIVE AS IT BASICALLY STATUS ALLS AND CANNOT BE

12    RESTARTED WITHOUT TURNING THE IGNITION

13    COMPLETELY OFF - WHICH IN TURN TURNS OFF POWER

14    ASSET TO STEERING AND BRAKES. CAR MAY TAKE UP TO 3

15    OR 4 TRIES TO START NORMALLY. THIS STALLING

16    CONDITION CAN OCCUR UP TO 5 TIMES IN AN 8 MILE TRIP.

17    *TR

18    58.    On September 15, 2015, the owner of a 2011 Ford Mustang

19    complained (ID Number: 10763826):

20    WHILE DRIVING DOWN THE LEFT LANE OF THE SAWGRASS

21    EXPRESSWAY, A VERY BUSY HIGHWAY BETWEEN FT.

22    LAUDERDALE AND MIAMI, I LOST ALL THROTTLE

23    RESPONSE. THE WRENCH LIGHT CAME ON THE

24    DASHBOARD AND I WENT FROM 60 MPH DOWN TO

25    NOTHING BY THE TIME I WAS OFF TO THE SIDE OF THE

26    ROAD. CARS BEHIND ME WERE OBVIOUSLY BRAKING

27    HARD TO AVOID SMASHING INTO ME. I TURNED THE CAR

28    OFF AND WAS ABOUT TO CALL AAA, BUT THE HEAT INDEX

1      THAT DAY WAS AROUND A MILLION DEGREES SO I

2      TURNED THE CAR BACK ON. THE THROTTLE RESPONSE

3      HAD RETURNED SO I CAUTIOUSLY LIMPED THE CAR BACK

4      HOME IN THE RIGHT HAND LANE THE WHOLE WAY. I

5      THOUGHT IT WAS SOME FREAK COMPUTER GLITCH UNTIL

6      IT HAPPENED AGAIN GOING TO THE STORE THE NEXT DAY.

7      I CALLED THE FORD DEALERSHIP AND BEFORE I EVEN GOT

8      THE PROBLEM OOUT OF MY MOUTH THE SERVICE TECH

9      SAID "IT IS YOUR THROTTLE BODY. WE SEE THIS ALL THE

10      TIME. IT WILL BE ABOUT $800 TO REPAIR". IF THE TECHS

11      ARE AWARE OF THIS PROBLEM AND IT IS ALL OVER THE

12      INTERNET WITH PEOPLE COMPLAINING ABOUT

13      DANGEROUS SITUATIONS THE HAVE BEEN PLACED IN AS A

14      RESULT, AND **THERE IS ALREADY A RECALL FOR THE**

15      **SAME PROBLEM IN OTHER FORD MODELS, THEN WHY**

16      **HASN'T THE NHTSA DONE ANYTHING TO FORCE FORD**

17      **TO RECALL FOR THE SAME PROBLEM ON THE**

18      **MUSTANG? DOES SOMEONE HAVE TO DIE FIRST?** HAS

19      SOMEBODY DIED BECAUSE OF THIS?

20      59.    On August 31, 2015, the owner of a 2011 Ford Edge complained (ID

21 Number: 10760282):

22      TL* THE CONTACT OWNS A 2011 FORD EDGE. WHILE

23      DRIVING APPROXIMATELY 55 MPH, THE SPEED

24      DECELERATED INDEPENDENTLY WITH THE ILLUMINATION

25      OF THE WRENCH  WARNING LIGHT. THE VEHICLE WAS

26      TOWED TO AN INDEPENDENT MECHANIC FOR DIAGNOSIS,

27      WHO CONFIRMED THE ELECTRONIC THROTTLE BODY

28      FAILED. THE VEHICLE WAS NOT REPAIRED. **THE**

**MANUFACTURER ISSUED A SPECIAL CUSTOMER SATISFACTION PROGRAM RELATED TO THE ELECTRONIC THROTTLE BODY HOWEVER, THE VEHICLE WAS NOT INCLUDED.** THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 40,000.

**E.    Ford Continued to Sell Class Vehicles With the Throttle Defect After CSP 13N03**

60.    Upon information and belief, Ford has failed to remedy the Throttle Defect in the Class Vehicles since the issuance of CSP 13N03 in January 2014, as indicated by complaints from owners of Class Vehicles from the 2014 and 2015 model years.

61.    Upon information and belief, Ford recognized that both the DS7Z-9E926-A (covered by CSP 13N03) and AT4Z-9E926-A (not covered) version Delphi Gen 6 ETBs were subject to the same types of failures caused by the same defect.  As a result, Ford superseded these original part numbers with new versions in an attempt to address throttle failures.

62.    At some point prior to 2014, Ford superseded part DS7Z-9E926-**A** with modified versions DS7Z-9E926-**B**, DSDS7Z-9E926-**C**, and eventually DSDS7Z- 9E926-**D**, which it used to repair those select vehicles covered by CSP 13N03.

63.    Similarly, Ford superseded part AT4Z-9E926-A in the Class Vehicles with AT4Z-9E926-B.  Upon information and belief, Ford introduced AT4Z-9E926-B in a failed attempt to address the Throttle Defect.

64.    Upon information and belief, AT4Z-9E926-B did not resolve the Throttle Defect and Ford has continued to sell model year 2014 and 2015 vehicles that include the Throttle Defect.

65.    For example, on September 11, 2015, the owner of a 2014 MKX

complained (ID No. 10763193):

> ON MONDAY (LABOR DAY), I WAS DRIVING AND STARTED TO MAKE A RIGHT TURN WHEN THE CAR STALLED. I WAS BESIDE A GAS STATIONED SO I MANAGED TO PULL IN (VERY HARD TO STEER) AND I NOTICED THE ?LOW OIL PRESSURE? ICON ON. I CAME TO A STOP AND PUSHED THE START BUTTON AND THE CAR STARTED AND DROVE WITHOUT ANY MORE PROBLEMS. MY HUSBAND CHECKED THE OIL WHEN I GOT HOME AND IT IS FULL. WHILE AT LONG LEWIS FORD IN HOOVER, THIS MORNING TO HAVE IT CHECKED WE HEARD A WOMAN DESCRIBE THE SAME SCENARIO WITH HER FORD. SHE STATED IT STALLED ABOUT 3 OR 4 TIMES ON HER WHILE DRIVING. I FEEL THIS IS A VERY SERIOUS ISSUE AND SOUNDS SIMILAR TO THE ISSUE ONE OF THE OTHER AUTOMOBILE MODELS HAD CAUSING DEATH AND INJURY.

66. Similarly, on June 28, 2016, the owner of a 2015 Ford Edge complained (ID No. 10881847):

> MY CAR IS FORD EDGE 2015 WITH ONLY 6000 MILES ON IT. I WAS ENTERING THE RAMP ON A FREEWAY AND WHEN ATTEMPTED TO ACCELERATE THE CAR JUST SHUT OFF BY ITSELF. I BLOCKED THE WHOLE ROAD BECAUSE COULD NOT MOVE. NO CHECK ENGINE LIGHT WAS ON JUST A MESSAGE DISPLAYED ON THE DASH "FULL ACCESSORY POWER ACTIVE" AND THE GREEN LIGHT ON THE STARTER BUTTON WAS FLASHING. HAD TO PUT THE CAR IN PARK AND WAIT 2-3 MIN UNTIL I COULD SUCCESSFULLY RESTART IT. THE NEXT DAY MY CAR DID THE SAME THING

ON A BUSY STREET INTERSECTION. I HAD TO WAIT AGAIN
A LITTLE BIT TO RESTART IT AND DROVE TO THE
DEALERSHIP. THEY TOOK THE CAR TO CHECK FOR ONE
DAY, NO RENTAL WAS PROVIDED. **I WAS TOLD THAT
THEY GET MANY DIFFERENT FORD VEHICLES WITH
THIS ISSUE. NEXT DAY I RECEIVED A PHONE CALL THAT
THEY RAN A COMPUTER SCAN AND THROTTLE BODY
WAS DEFECTIVE.** THROTTLE BODY AIR INTAKE WAS
REPLACED. VERY SCARY AND DANGEROUS SITUATION
THAT CAN HAPPEN ANYTIME, ANYWHERE WITHOUT ANY
KIND OF WARNING. I BELIEVE IT NEEDS ATTENTION...

### F.    Ford's Knowledge of the Throttle Defect

67.    Upon information and belief, Ford has known of the aforementioned problems with the Delphi Gen 6 electronic throttle body since at least as early as 2009, but has failed to disclose this material information to the owners and purchasers of Class Vehicles.  Ford first learned that the specific Delphi Gen 6 ETBs placed in Class Vehicles were defective soon after the vehicles were released in 2011.

68.    There have been thousands of consumer complaints made directly to Ford dealerships going back as early as 2011 regarding the Throttle Defect.  When the NHTSA/ODI completed its preliminary investigation regarding CSP 13N03 vehicles, it concluded that Ford had received 10,999 complaints directly, in addition to the 1,471 complaints filed with the NHTSA, regarding the vehicles ultimately covered by CSP 13N03.

69.    As revealed in the NHTSA investigation, on September 26, 2012, Ford employees exchanged emails acknowledging the existence of a defect in some vehicles equipped with Delphi Gen 6 ETBs.  On that day, one Ford employee, Derek Harmon, explained the situation: "The intermittent no DTC loss or RPM

1  problem is getting so much attention on the 10-12 Escape/Fusion I've not put this

2  on the QSF emerging deck.  We've gotten too many phone calls from dealership

3  technicians needing help . . . ."

4      70.    Moreover, on or around August 30, 2012, the North Carolina

5  Consumer Commission petitioned NHTSA to investigate the alternative version of

6  the Delphi Gen 6 ETB (DS7Z-9E926).

7      71.    By December 14, 2012, Ford responded to NHTSA's inquiry and

8  formally acknowledged the possibility of a likely defect in certain Delphi Gen 6

9  ETBs after a summary investigation.  The existence of a throttle defect in the

10  DS7Z-9E926 version of the Delphi Gen 6 ETB, combined with Ford's knowledge

11  that the AT4Z-9E926 version was substantially similar, as well as information

12  regarding the manifestation of the Throttle Defect obtained from dealers and from

13  the NHTSA, put Ford on notice that the Class Vehicles were also defective.

14      72.    Upon information and belief, Ford acquired additional, exclusive

15  knowledge about the Throttle Defect in early 2013 when it collected voluminous

16  amounts of data to respond to the NHTSA investigation regarding Delphi Gen 6

17  ETB failures.

18      73.    Upon information and belief, Ford collected and analyzed data

19  regarding Edge, Mustang, Ford F-150, and Lincoln MKX throttle failures, but

20  failed to disclose the existence of the Throttle Defect in the Class Vehicles at issue

21  in this litigation.

22  **V.    TOLLING OF THE STATUTE OF LIMITATIONS**

23          **A.    Discovery Rule Tolling**

24      74.    Plaintiffs could not have discovered through reasonable diligence that

25  their Class Vehicles were defective within the time period of any applicable statutes

26  of limitation.

27      75.    Among other things, neither Plaintiffs nor the other Class members

28  knew or could have known that the Class Vehicles are equipped with defective

1    Delphi Gen 6 ETBs which result in sudden and unexpected deceleration and loss of

2    throttle control.

3        **B.    Fraudulent Concealment Tolling**

4        76.    Throughout the time period relevant to this action, Ford concealed

5    from and failed to disclose to Plaintiffs and the other Class members vital

6    information about the potentially deadly defect described herein.  Indeed, Ford kept

7    Plaintiffs and the other Class members ignorant of vital information essential to the

8    pursuit of their claims, and as a result, neither Plaintiffs nor the other Class

9    members could have discovered the Throttle Defect, even upon reasonable exercise

10   of diligence.

11       77.    Specifically, Ford has known that the Delphi Gen 6 ETB it installed in

12   the Class Vehicles is prone to sudden and premature failure, resulting in sudden

13   shift to limp-home mode causing sudden deceleration and loss of throttle control.

14       78.    Despite its knowledge of these defects, Ford failed to disclose,

15   concealed, and continues to conceal, this critical information from Plaintiffs and the

16   other members of the Class even though, at any point in time, it could have done so

17   through individual correspondence, media release, or any other means.

18       79.    Plaintiffs and the other Class members justifiably relied on Ford to

19   disclose these material defects in the Ford vehicles that they purchased or leased, as

20   such defects were hidden and not discoverable through reasonable efforts by

21   Plaintiffs and the other Class members.

22       80.    Thus, the running of all applicable statutes of limitation have been

23   tolled and suspended with respect to any claims that the Plaintiffs and the other

24   Class members have sustained as a result of the defects by virtue of the fraudulent

25   concealment doctrine.

26       **C.    Estoppel**

27       81.    Ford was under a continuous duty to disclose to Plaintiffs and the other

28   Class members the true character, quality, and nature of the Class Vehicles.

82.     Ford knowingly failed to disclose or concealed the true nature, quality, and character of the Class Vehicles for consumers.

83.     Based on the foregoing, Ford is estopped from relying on any statutes of limitation in defense of this action.

## VI.     <u>CLASS ACTION ALLEGATIONS</u>

84.     Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.

85.     Plaintiffs seek to represent a class ("the Nationwide Class") defined as:

- All current and former owners and lessees of a Class Vehicle (as defined herein) that was purchased or leased within the United States (including its Territories and the District of Columbia).

86.     Plaintiffs also seek to represent the following statewide classes ("the Statewide Classes") defined as follows:

- All current and former owners and lessees of a Class Vehicle (as defined herein) that was purchased or leased within California. ("the California Class").

- All current and former owners and lessees of a Class Vehicle (as defined herein) that was purchased or leased within Florida. ("the Florida Class").

- All current and former owners and lessees of a Class Vehicle (as defined herein) that was purchased or leased within Alabama ("the Alabama Class").

87.     Excluded from each of the Nationwide and Statewide Classes are Ford and any of its affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers and their immediate family members; and the Court staff assigned to this case. Plaintiffs reserve the right to amend these Nationwide and Statewide Class definitions, as appropriate, during the course of

this litigation.

88.    This action has been brought and may properly be maintained on behalf of the Nationwide and Statewide Classes proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

89.    **Numerosity - Federal Rule of Civil Procedure 23(a)(1).**  The members of the Nationwide and Statewide Classes are so numerous and geographically disperse that individual joinder of all class members is impracticable.  While the precise numbers of the Nationwide and Statewide Classes are unknown to Plaintiffs, Plaintiffs are informed and believe that Ford has sold hundreds of thousands of Class Vehicles from 2011 to 2015.  For example, Ford sold approximately 611,000 model year 2011-2015 Ford Edges.  The precise number of Nationwide and Statewide Class members may be ascertained from Ford's books and records.  Nationwide and Statewide Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

90.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**  This action involves common questions of law and fact, which predominate over any questions affecting individual Nationwide and Statewide Class members, including, without limitation:

    a.    whether Ford engaged in the conduct alleged herein;

    b.    whether Ford's conduct violates applicable law;

    c.    whether Ford designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

    d.    whether Ford misled Nationwide and Statewide Class members about the quality of the Class Vehicles;

    e.    whether the Class Vehicles contain the Throttle Defect;

f.    whether Ford breached the implied warranty of merchantability when it sold Class Vehicles with defective throttle bodies;

g.    whether Ford made express warranties with respect to the Class Vehicles;

h.    whether Defendant breached its express warranties to the Nationwide and Statewide Classes with respect to the Class Vehicles;

i.    whether Ford knew or should have known about the Throttle Defect, but failed to disclose it to Plaintiffs and the other Nationwide and Statewide Class members;

j.    whether Ford omitted and concealed material information regarding the Class Vehicles;

k.    whether Ford had and/or has a duty to disclose the Throttle Defect prior to selling the Class Vehicles to the Plaintiffs and the other members of the Nationwide and Statewide Classes;

l.    whether Ford's conduct constitutes a deceptive act or practice in violation of the state consumer protection statutes alleged herein;

m.    whether Plaintiffs and the other members of the Nationwide and Statewide Classes have suffered monetary damages as a result of Ford's conduct;

n.    whether Plaintiffs and the Nationwide and Statewide Classes are entitled to compensatory, exemplary, statutory, or punitive damages, and the amount of any such damages; and

o.    whether Ford should be declared financially responsible for notifying Class members about the defective nature of the Class Vehicles.

91.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs'

claims are typical of other Nationwide and Statewide Class members' claims
because Plaintiffs and the Nationwide and Statewide Class members purchased or
leased Class Vehicles that suffer from the Throttle Defect.  Neither Plaintiffs nor
the other Nationwide and Statewide Class members would have purchased the
Class Vehicles, or they would have paid less for the Class Vehicles, had they
known of the Throttle Defect.  Plaintiffs and the other Nationwide and Statewide
Class members suffered damages as a direct and proximate result of the same
wrongful practices in which Ford engaged.  Plaintiffs' claims arise from the same
practices and course of conduct that give rise to the claims of the other Nationwide
and Statewide Class members.

92.    **Adequacy of Representation – Federal Rule of Civil Procedure
23(a)(4).**  Plaintiffs are adequate Class representatives because their interests do not
conflict with the interests of the other members of the Nationwide and Statewide
Classes that they respectively seek to represent, Plaintiffs have retained counsel that
is competent and experienced in complex class action litigation, and Plaintiffs
intend to prosecute this action vigorously.  The Nationwide and Statewide Classes'
interests will be fairly and adequately protected by Plaintiffs and their counsel.

93.    **Declaratory and Injunctive Relief – Federal Rule of Civil
Procedure 23(b)(2).**  Ford has acted or refused to act on grounds generally
applicable to Plaintiffs and the other Nationwide and Statewide Class members,
thereby making appropriate final injunctive and declaratory relief, as described
below, with respect to the Nationwide and Statewide Class members as a whole.

94.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).**  A class
action is superior to any other available means for the fair and efficient adjudication
of this controversy, and no unusual difficulties are likely to be encountered in the
management of this class action.  The damages or other financial detriment suffered
by Plaintiffs and the other Nationwide and Statewide Class members is relatively
small compared to the burden and expense that would be required to individually

1   litigate their claims against Ford, so it would be impracticable for the Nationwide
2   and Statewide Class members to individually seek redress for Ford's wrongful
3   conduct.  Even if the Nationwide and Statewide Class members could afford
4   litigation, the court system could not.  Individualized litigation creates a potential
5   for inconsistent and contradictory judgments, and increases the delay and expense
6   to all parties and the court system.  By contrast, the class action device presents far
7   fewer management difficulties, and provides the benefits of a single adjudication,
8   economy of scale, and comprehensive supervision by a single court.

9   **VII.   CLAIMS FOR RELIEF**

10   **A.    Claim Brought on Behalf of the Nationwide Class**

11   **COUNT 1**

12   **VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**

13   **15 U.S.C. §§ 2301, *et seq.***

14   95.    Plaintiffs repeat and reallege paragraphs 1-94 as if fully set forth
15   herein.

16   96.    Plaintiffs bring this Count individually and on behalf of the other
17   members of the Nationwide Class (the "Class," for purposes of this Count).

18   97.    This Court has jurisdiction to decide claims brought under 15 U.S.C.
19   § 2301 by virtue of 28 U.S.C. § 1332(a) and (d).

20   98.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss
21   Warranty Act, 15 U.S.C. 2301(3).

22   99.    Ford is a "supplier" and "warrantor" within the meaning of 15 U.S.C.
23   § 2301(4) and (5).

24   100.   The Class Vehicles are "consumer products" within the meaning of the
25   Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

26   101.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer
27   who is damaged by the failure of a warrantor to comply with a written warranty.

28   102.   In its New Vehicle Limited Warranty, Ford expressly warranted that it

would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period. Ford provides the following language in its 2014 Model Year Ford Warranty Guide: "[A]uthorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship."

103. Ford's Limited Warranty constitutes a "written warranty" within the meaning of 15 U.S.C. § 2301(6). The Class Vehicles' implied warranties of merchantability are covered by 15 U.S.C. § 2301(7).

104. With respect to Class members' purchases or leases of the Class Vehicles, the terms of Ford's written warranty and implied warranty became part of the basis of the bargain between Ford, on the one hand, and Plaintiffs and each of the other Class members, on the other.

105. Ford breached its written and implied warranties as described in detail above. The Class Vehicles share a uniform defect in that they are equipped with defective electronic throttle bodies that are prone to sudden and unexpected failure during normal operation, leaving occupants vulnerable to accidents, serious injuries, and/or death. Ford has acknowledged the existence of the Throttle Defect in other models of vehicles containing Delphi Gen 6 ETBs, but has failed to acknowledge or correct the Throttle Defect in the Class Vehicles.

106. Plaintiffs and each of the other Class members have had sufficient direct dealings with either Ford or its agents (including Ford dealerships) to establish privity of contract between Ford and Plaintiffs and each of the other Class members. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the

warranty agreements were designed for and intended to benefit the consumers only. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

107.   Plaintiff Aviles, individually and on behalf of the other Class members, notified Ford of the Throttle Defect, and its corresponding breach of warranties, through a notice letter dated December 14, 2016, and delivered by Federal Express to Ford Motor Company in Dearborn, Michigan.  Ford was also provided notice of the Throttle Defect through numerous complaints that it received directly and through its dealers, as well as its own internal engineering knowledge. Ford has not taken any measures to cure its warranty breaches to Plaintiffs and the other Class members.

108.   At the time of the sale or lease of each Class Vehicle, Ford knew, should have known, or was reckless in not knowing of its failure to disclose information concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design.  Ford has continued to show its refusal to rectify the situation by refusing to address the Throttle Defect.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Ford a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

109.   The amount in controversy of the Plaintiffs' individual claims meets or exceeds $25.00 in value.  In addition, the amount in controversy meets or exceeds $75,000 in value, exclusive of interest and costs, computed on the basis of all claims to be determined in this suit.

110.   As a direct and proximate result of Ford's breach of the Limited Warranty and the implied warranty of merchantability, Plaintiffs and the other Class members have suffered damages in an amount to be determined at trial.

111.   Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including the diminution in value of their vehicles, in an amount to be proven at trial.

**B.   Claims Brought on Behalf of the Statewide Classes**

**1.   Claims Brought on Behalf of the California Class**

**COUNT 2**

**VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT**

**Cal Civ. Code §§ 1750, *et seq*.**

112.   Plaintiff Aviles ("Plaintiff" for purposes of the California Class's Claims) repeats and realleges Paragraphs 1-94 as if fully set forth herein.

113.   Plaintiff brings this Count individually and on behalf the other members of the California class (the "Class," for purposes of this Count).

114.   Plaintiff and the other members of the Class were deceived by Ford's failure to disclose that the Class Vehicles share a uniform defect in that they are equipped with defective electronic throttle bodies that are prone to sudden and unexpected failure during normal operation, leaving occupants of the Class Vehicles vulnerable to crashes, serious injury, and death.

115.   Ford engaged in unfair or deceptive acts or practices when, in the course of its business it, among other acts and practices, knowingly omitted material facts as to the characteristics and qualities of the Class Vehicles.

116.   Ford failed to disclose material information concerning the Class Vehicles that it had a duty to disclose.  Ford had a duty to disclose the Throttle Defect because, as detailed above, (a) Ford knew about the Throttle Defect and the safety concerns it raised; (b) Ford had exclusive knowledge of material facts not known to the general public, Plaintiff, or the other Class members; and (c) Ford actively concealed material facts concerning the Throttle Defect from the general public, Plaintiff, and the other Class members.  As detailed above, the information

1   concerning the defect was known to Ford at the time of advertising and selling the

2   Class Vehicles, all of which was intended to induce consumers to purchase the

3   Class Vehicles.

4       117.   Ford intended for the Plaintiff and the other Class members to rely on

5   it to provide safe, adequately designed, and adequately manufactured automobiles

6   and to honestly and accurately reveal the problems described throughout this

7   Complaint.

8       118.   Ford intentionally failed or refused to disclose the Throttle Defect to

9   consumers.

10      119.   Ford's conduct and deceptive omissions were intended to induce

11  Plaintiff and the other Class members to believe that the Class Vehicles were safe,

12  adequately designed, and adequately manufactured automobiles.

13      120.   Ford's conduct constitutes unfair acts or practices as defined by the

14  California Consumers Legal Remedies Act (the "CLRA").

15      121.   Plaintiff and the other members of the Class have suffered injury in

16  fact and actual damages resulting from Ford's material omissions because they paid

17  inflated purchase prices for the Class Vehicles.  Plaintiff and the other Class

18  members, however, reserve any claim for damages under the CLRA and by this

19  Complaint bring only an action for injunctive relief under the CLRA pursuant to

20  Section 1782(d) of the Act.

21      122.   Pursuant to Section 1782 of the CLRA, Plaintiff notified Ford on

22  December 16, 2016, in writing, of its violations of Section 1770 of the CLRA, and

23  demanded that Defendant rectify the problems associated with the behavior detailed

24  above and give notice to all affected consumers of Ford's intent to so act.  To date,

25  Ford has not responded to Plaintiff's letter.

26      123.   If Ford fails to rectify or agree to rectify the problems associated with

27  the actions detailed above and give notice to all affected consumers within 30 days

28  of the date of written notice pursuant to Section 1782 of the CLRA, Plaintiff will

amend this complaint to add claims for actual, punitive, and statutory damages, restitution, and disgorgement under the CLRA as appropriate under California Civil Code § 1780, pursuant to California Civil Code § 1782(d) ("Not less than 30 days after the commencement of an action for injunctive relief, and after compliance with subdivision (a), the consumer may amend his or her complaint without leave of court to include a request for damages).

124.   Pursuant to California Civil Code § 1780(d), attached hereto as Exhibit A is the affidavit showing that this action has been commenced in the proper forum.

<u>COUNT 3</u>

**VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT**

**FOR BREACH OF IMPLIED WARRANTY**

**Cal Civ. Code §§ 1790, *et seq*.**

125.   Plaintiff Aviles ("Plaintiff" for purposes of the California Class's Claims) repeats and realleges Paragraphs 1-94 as if fully set forth herein.

126.   Plaintiff brings this Count individually and on behalf of the other members of the California Class (the "Class," for purposes of this Count).

127.   The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

128.   Ford is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

129.   Ford impliedly warranted to Plaintiff and the other members of the Class that the Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Class Vehicles are not of the quality that a buyer would reasonably expect.

130.   Cal. Civ. Code § 1791.1(a) states that: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1) Pass without objection in the trade under the contract description;

(2) Are fit for the ordinary purposes for which such goods are used;

(3) Are adequately contained, packaged, and labeled; and

(4) Conform to the promises or affirmations of fact made on the container or label.

131.   Ford breached the implied warranty of merchantability by selling and leasing Class Vehicles with the Throttle Defect.

132.   The Class Vehicles would not pass without objection in the automotive trade because they share a common design defect in that they are equipped with defective throttle bodies, leaving occupants of the Class Vehicles vulnerable to crashes, serious injury, or death.

133.   Because of the Throttle Defect, the Class Vehicles are not safe to drive and thus are not fit for ordinary purposes.

134.   The Class Vehicles were not adequately labeled because the labeling fails to disclose the Throttle Defect.

135.   Plaintiff Aviles, individually and on behalf of the other Class members, notified Ford of the Throttle Defect, and its corresponding breach of warranties, through a notice letter dated December 14, 2016, and delivered by Federal Express to Ford Motor Company in Dearborn, Michigan.  Ford was also provided notice of the Throttle Defect through numerous complaints that it received directly and through its dealers, as well as its own internal engineering knowledge.

136.   Ford has had the opportunity to cure the defect in the Class Vehicles, but it has chosen not to do so.  Giving Ford a chance to cure the defect is not practicable in this case and would serve only to delay this litigation, and is thus unnecessary.

137.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the other members of the Class received goods with a substantially impaired value.

138.   Plaintiff and the other members of the Class have been damaged as a

1  result of the diminished value of the Class Vehicles.

2      139.   Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiff and other

3  members of the Class are entitled to damages and other legal and equitable relief,

4  including, at their election, the purchase price of their Class Vehicles, or the

5  overpayment or diminution in value of their Class Vehicles.

6      140.   Under Cal. Civ. Code § 1794, Plaintiff and the other members of the

7  Class are entitled to costs and attorneys' fees.

8  **COUNT 4**

9  **VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANY ACT**

10  **FOR BREACH OF EXPRESS WARRANTY**

11  **Cal Civ. Code §§ 1790,** ***et seq*.**

12      141.   Plaintiff Aviles ("Plaintiff" for purposes of the California Class's

13  Claims) repeats and realleges Paragraphs 1-94 as if fully set forth herein.

14      142.   Plaintiff brings this Count individually and on behalf of the other

15  members of the California Class (the "Class," for purposes of this Count).

16      143.   The Class Vehicles are "consumer goods" within the meaning of

17  California Civil Code § 1791(a).

18      144.   Ford is a "manufacturer" of the Defective Vehicles within the meaning

19  of California Civil Code § 1791(j).

20      145.   Plaintiff and the other members of the Class bought or leased Class

21  Vehicles manufactured by Ford.

22      146.   Ford made express warranties to Plaintiff and the other members of the

23  Class within the meaning of California Civil Code §§ 1791.2 and 1793.2.

24      147.   In its New Vehicle Limited Warranty, Ford expressly warranted that it

25  would repair or replace defects in material or workmanship free of charge if they

26  became apparent during the warranty period.  Ford provides the following language

27  in its 2014 Model Year Ford Warranty Guide: "[A]uthorized Ford Motor Company

28  dealers will, without charge, repair, replace, or adjust all parts on your vehicle that

malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship."

148.    As set forth above in detail, the Class Vehicles share a uniform defect in that they are equipped with defective electronic throttle bodies which cause unsafe and unexpectedly sudden deceleration and stalling in the Class Vehicles.

149.    The Class Vehicles are covered by Ford's express warranty.  The defect described herein substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers, including Plaintiff and the other Class members.

150.    Plaintiff Aviles, individually and on behalf of the other Class members, notified Ford of the Throttle Defect, and its corresponding breach of warranties, through a notice letter dated December 14, 2016, and delivered by Federal Express to Ford Motor Company in Dearborn, Michigan.  Ford was also provided notice of the Throttle Defect through numerous complaints that it received directly and through its dealers, as well as its own internal engineering knowledge.

151.    Ford has had the opportunity to cure the defect in the Class Vehicles, but it has chosen not to do so.  Giving Ford a chance to cure the defect is not practicable in this case and would serve only to delay this litigation, and is thus unnecessary.

152.    As a result of Ford's breach of its express warranties, Plaintiff and the other members of the Class received goods that are unreasonably dangerous and that have substantially impaired value.  Plaintiff and the other members of the Class have been damaged as a result of the diminished value of their Class Vehicles.

153.    Pursuant to California Civil Code §§ 1793.2 & 1794, Plaintiff and the other members of the Class are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

154.    Pursuant to California Civil Code § 1794, Plaintiff and the other members of the Class are entitled to costs and attorneys' fees.

# COUNT 5

## FRAUDULENT OMISSION

155.   Plaintiff Aviles ("Plaintiff" for purposes of the California Class's Claims) repeats and realleges Paragraphs 1-94 as if fully set forth herein.

156.   Plaintiff brings this Count individually and on behalf of the other members of the California Class ("Class," for purposes of this Count).

157.   Ford was aware of the Throttle Defect when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

158.   Ford, as manufacturer of consumer products and motor vehicles, has a duty to disclose known defects and material safety information, such as the Throttle Defect, to Plaintiff and the other members of the Class.

159.   Having been aware of the Throttle Defect, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Throttle Defect, Ford had a duty to disclose the defect to Plaintiff and other members of the Class in connection with the sale or lease of the Class Vehicles.

160.   Ford did not disclose the Throttle Defect to Plaintiff and the other members of the Class in connection with the sale and lease of the Class Vehicles.

161.   Plaintiff and the other members of the Class reasonably relied on Ford to perform its duty to disclose the known safety-related defects and other material defects with respect to the Class Vehicles.

162.   For the reasons set forth above, the Throttle Defect constitutes material information with respect to the sale or lease of the Class Vehicles.

163.   Had Plaintiff and the other members of the Class known of the Throttle Defect, they would not have purchased the Class Vehicles or would have paid less for the Class Vehicles.

164.   Through its omissions regarding the Throttle Defect, Ford intended to induce, and did induce, Plaintiff and the other members of the Class to either

1    purchase or lease a Class Vehicle that they otherwise would not have purchased or

2    leased, or pay more for a Class Vehicle than they otherwise would have paid.

3         165.   As a direct and proximate result of Ford's omission, Plaintiff and the

4    other members of the Class have incurred damages in an amount to be proven at

5    trial.

6                       **COUNT 6**

7                **UNJUST ENRICHMENT**

8         166.   Plaintiff Aviles ("Plaintiff" for purposes of the California Class's

9    Claims) repeats and realleges Paragraphs 1-94 as if fully set forth herein.

10        167.   Plaintiff brings this Count individually and on behalf of the other

11    members of the California Cass (the "Class," for purposes of this Count).

12        168.   Ford has benefitted from selling and leasing at an unjust profit

13    defective Class Vehicles that had artificially inflated prices due to Ford's

14    concealment of the Throttle Defect, and Plaintiff and the other members of the

15    Class have overpaid for these vehicles.

16        169.   Ford has received and retained unjust benefits from Plaintiff and the

17    other members of the Class, and inequity has resulted.

18        170.   It is inequitable and unconscionable for Ford to retain these benefits.

19        171.   Because Ford concealed its fraud and deception, Plaintiff and the other

20    members of the Class were not aware of the true facts concerning the Class

21    Vehicles and did not benefit from Ford's misconduct.

22        172.   Ford knowingly accepted the unjust benefits of its wrongful conduct.

23        173.   As a result of Ford's misconduct, the amount of its unjust enrichment

24    should be disgorged and returned to Plaintiff and the other members of the Class in

25    an amount to be proven at trial.

26

27

28

- 41 -

## COUNT 7

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

174.   Plaintiff Aviles ("Plaintiff" for purposes of the California Class's Claims) repeats and realleges Paragraphs 1-94 as if fully set forth herein.

175.   Plaintiff brings this Count individually and on behalf of the other members of the California Class ("Class," for purposes of this Count).

176.   California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business acts or practices."

177.   Ford's conduct violated multiple statutes and the common law, as alleged herein.

178.   Ford has violated § 17200 by knowingly selling Class Vehicles that include the Throttle Defect that results in unsafe and unexpectedly sudden deceleration and stalling.

179.   Ford's conduct was unscrupulous, offended established public policy, and was fraudulent.

180.   The harm caused by Ford's conduct greatly outweighs any benefit to consumers.

181.   Plaintiff relied on the omissions of Ford with respect to the quality and reliability of the Class Vehicles.  Plaintiff and the other Class members would not have purchased or leased their Class Vehicles, or paid as much for them, but for Ford's omissions.

182.   Ford concealed and failed to disclose material information about the Class Vehicles in a manner that is likely to, and in fact did, deceived consumers and the public.

183.   All of the wrongful conduct alleged herein occurred in the conduct of Ford's business.

184.   Plaintiff, individually and on behalf of the other Class members,

requests that this Court restore to Plaintiff and the other Class members any money acquired by unfair competition, including restitution and/or restitutionary disgorgement.

**2.    Claims Brought on Behalf of the Florida Class**

**COUNT 8**

**VIOLATION OF THE FLORIDA DECEPTIVE**

**AND UNFAIR TRADE PRACTICES ACT**

**Fla. Stat. §§ 501.201,** *et seq.*

185.    Plaintiffs Kiery and Kelder ("Plaintiffs," for the purposes of the Florida Class's claims) repeat and reallege paragraphs 1-94 as if fully set forth herein.

186.    Plaintiffs bring this Count individually and on behalf of the other members of the Florida Class (the "Class," for purposes of this Count).

187.    Plaintiffs are "consumers" within the meaning of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.203(7).

188.    Ford is engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

189.    FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ."  Fla. Stat. § 501.204(1).

190.    By the conduct described in detail above and incorporated herein, Ford engaged in unfair and deceptive trade practices that violated the FDUTPA.

191.    Ford's omissions regarding the Throttle Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase or lease (or to pay the same price for) the Class Vehicles.

192.    Ford intended for Plaintiffs and the other members of the Class to rely on its omissions regarding the Throttle Defect.

193.    Plaintiffs and the other members of the Class justifiably acted or relied

1  to their detriment upon Ford's omissions of fact concerning the above-described

2  Throttle Defect.

3      194.  Had Ford disclosed all material information regarding the Throttle

4  Defect to Plaintiffs and the other members of the Class, Plaintiffs and the other

5  members of the Class would not have purchased or leased Class Vehicles, or would

6  have paid less to do so.

7      195.  Ford's omissions have deceived Plaintiffs and the other members of

8  the Class, and those same business practices have deceived or are likely to deceived

9  members of the consuming public and the other members of the Class.

10      196.  In addition to being deceptive, the business practices of Ford were

11  unfair because Ford knowingly sold Plaintiffs and the other members of the Class

12  vehicles that are inherently, and unreasonably, dangerous as a result of the Throttle

13  Defect.

14      197.  The injuries to Plaintiffs and the other members of the Class are

15  substantial and greatly outweigh any alleged countervailing benefit to Plaintiffs and

16  the other members of the Class or to competition under all of the circumstances.

17  Moreover, in light of Ford's knowledge of the Throttle Defect, the injury is not one

18  that Plaintiffs or the other members of the Class could have reasonably avoided.

19      198.  As a direct and proximate result of Ford's unfair and deceptive trade

20  practices, Plaintiffs and the other members of the Class have suffered ascertainable

21  loss and actual damages.  Plaintiffs and the other members of the Class who

22  purchased or leased the Class Vehicles would not have purchased or leased the

23  Class Vehicles, or, alternatively, would have paid less for them had the truth about

24  the Throttle Defect been disclosed.  Plaintiffs and the other members of the Class

25  also suffered diminished value of their vehicles.  Plaintiffs and the other members

26  of the Class are entitled to recover actual damages, attorneys' fees and costs, and all

27  other relief allowed under Fla. Stat §§ 501.201, *et seq.*

28

## COUNT 9

### BREACH OF EXPRESS WARRANTY

#### Fla. Stat. §§ 672.313 and 680.21

199.   Plaintiffs Kiery and Kelder ("Plaintiffs," for the purposes of the Florida Class's claims) repeat and reallege Paragraphs 1-94 as if fully set forth herein.

200.   Plaintiffs bring this Count individually and on behalf of the other members of the Florida Class (the "Class," for purposes of this Count).

201.   Ford is and was at all relevant times a merchant with respect to the Class Vehicles.

202.   In its New Vehicle Limited Warranty, Ford expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.  Ford provides the following language in its 2014 Model Year Ford Warranty Guide: "[A]uthorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship."

203.   Ford's Limited Warranty was part of the basis of the bargain that was reached when Plaintiffs and the other Class members purchased or leased their Class Vehicles equipped with defective electronic throttle bodies.

204.   Ford breached the express warranty to repair defects in materials and workmanship within the Class Vehicles.  Ford has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

205.   Plaintiff Aviles, individually and on behalf of the other Class members, notified Ford of the Throttle Defect, and its corresponding breach of warranties, through a notice letter dated December 14, 2016, and delivered by Federal Express to Ford Motor Company in Dearborn, Michigan.  Ford was also provided notice of the Throttle Defect through numerous complaints that it received

1   directly and through its dealers, as well as its own internal engineering knowledge.

2   Ford has not taken any measures to cure its warranty breaches to Plaintiffs and the

3   other Class members.

4        206.   Furthermore, the Limited Warranty fails in its essential purpose

5   because the contractual remedy is insufficient to make Plaintiffs and the other Class

6   members whole and because Ford has failed and/or has refused to adequately

7   provide the promised remedies within a reasonable time.

8        207.   Accordingly, recovery by Plaintiffs and the other Class members is not

9   limited to the limited warranty of repair to parts defective in materials and

10   workmanship, and Plaintiffs, individually and on behalf of the other Class

11   members, seek all remedies allowable by law.

12        208.   Also, and as alleged in more detail herein, at the time that Ford

13   warranted and sold the Class Vehicles it knew that the Class Vehicles did not

14   conform to the warranty and were inherently defective, and Ford improperly

15   concealed material facts regarding its Class Vehicles.  Plaintiffs and the other Class

16   members were, therefore, induced to purchase or lease the Class Vehicles under

17   false pretenses.

18        209.   Moreover, much of the damage flowing from the Class Vehicles

19   cannot be resolved through the limited remedy of repairs, as those incidental and

20   consequential damages have already been suffered due to Ford's improper conduct

21   as alleged herein, and due to its failure and/or continued failure to provide such

22   limited remedy within a reasonable time, and any limitation on Plaintiffs and the

23   other Class members' remedies would be insufficient to make them whole.

24        210.   As a direct and proximate result of Ford's breach of its express

25   warranty, Plaintiffs and the other Class members have been damaged in an amount

26   to be determined at trial.

27

28

## COUNT 10

### FRAUDULENT OMISSION

211.   Plaintiffs Kiery and Kelder ("Plaintiffs," for the purposes of the Florida Class's claims) repeat and reallege paragraphs 1- 94 as if fully set forth herein.

212.   Plaintiffs bring this Count individually and on behalf of the other members of the Florida Class (the "Class," for purposes of this Count).

213.   Ford was aware of the Throttle Defect when it marketed and sold the Class Vehicles to Plaintiffs and the other members of the Class.

214.   Ford, as a manufacturer of consumer products and motor vehicles, has a duty to disclose known defects and material safety information, such as the Throttle Defect, to Plaintiffs and the other members of the Class.

215.   Having been aware of the Throttle Defect, and having known that Plaintiffs and the other members of the Class could not have reasonably been expected to know of the Throttle Defect, Ford had a duty to disclose the defect to Plaintiffs and other members of the Class in connection with the sale or lease of the Class Vehicles.

216.   Ford did not disclose the Throttle Defect to Plaintiffs and the other members of the Class in connection with the sale and lease of the Class Vehicles.

217.   Plaintiffs and the other members of the Class reasonably relied on Ford to perform its duty to disclose the known safety-related defects and other material defects with respect to the Class Vehicles.

218.   For the reasons set forth above, the Throttle Defect constitutes material information with respect to the sale or lease of the Class Vehicles.

219.   Had Plaintiffs and the other members of the Class known of the Throttle Defect, they would not have purchased the Class Vehicles or would have paid less for the Class Vehicles.

220.   Through its omissions regarding the Throttle Defect, Ford intended to

1  induce, and did induce, Plaintiffs and the other members of the Class to either

2  purchase or lease a Class Vehicle that they otherwise would not have purchased or

3  leased, or pay more for a Class Vehicle than they otherwise would have paid.  As a

4  direct and proximate result of Ford's omission, Plaintiffs and the other members of

5  the Class have incurred damages in an amount to be proven at trial.

## COUNT 11

### UNJUST ENRICHMENT

8  221.  Plaintiffs Kiery and Kelder ("Plaintiffs," for the purposes of the

9  Florida Class's claims) repeat and reallege paragraphs 1-94 as if fully set forth

10  herein.

11  222.  Plaintiffs bring this Count individually and on behalf of the other

12  members of the Florida Class (the "Class," for purposes of this Count).

13  223.  Ford has benefitted from selling and leasing at an unjust profit

14  defective Class Vehicles that had artificially inflated prices due to Ford's

15  concealment of the Throttle Defect, and Plaintiffs and the other members of the

16  Class have overpaid for these vehicles.

17  224.  Ford has received and retained unjust benefits from Plaintiffs and the

18  other members of the Class, and inequity has resulted.

19  225.  It is inequitable and unconscionable for Ford to retain these benefits.

20  226.  Because Ford concealed its fraud and deception, Plaintiffs and the

21  other members of the Class were not aware of the true facts concerning the Class

22  Vehicles and did not benefit from Ford's misconduct.

23  227.  Ford knowingly accepted the unjust benefits of its wrongful conduct.

24  228.  As a result of Ford's misconduct, the amount of its unjust enrichment

25  should be disgorged and returned to Plaintiffs and the other members of the Class in

26  an amount to be proven at trial.

27

28

### 3.   Claims Brought on Behalf of the Alabama Class

## COUNT 12

### BREACH OF EXPRESS WARRANTY

### Ala. Code. §§ 7-2-313 and 7-2A-210

229.   Plaintiff Cowen ("Plaintiff," for purposes of the Alabama Class's claims) repeats and realleges paragraphs 1-94 as if fully set forth herein.

230.   Plaintiff brings this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

231.   Ford is and was at all relevant times a merchant with respect to the Class Vehicles.

232.   In its New Vehicle Limited Warranty, Ford expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.  Ford provides the following language in its 2014 Model Year Ford Warranty Guide: "[A]uthorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship."

233.   Ford's Limited Warranty was part of the basis of the bargain that was reached when Plaintiffs and the other Class members purchased or leased their Class Vehicles equipped with defective electronic throttle bodies.

234.   Ford breached its express warranty to repair defects in materials and workmanship within the Class Vehicles.  Ford has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

235.   Plaintiff Aviles, individually and on behalf of the other Class members, notified Ford of the Throttle Defect, and its corresponding breach of warranties, through a notice letter dated December 14, 2016, and delivered by Federal Express to Ford Motor Company in Dearborn, Michigan.  Ford was also provided notice of the Throttle Defect through numerous complaints that it received

1  directly and through its dealers, as well as its own internal engineering knowledge.

2  Ford has not taken any measures to cure its warranty breaches to Plaintiff and the

3  other Class members.

4       236.  Furthermore, the Limited Warranty fails in its essential purpose

5  because the contractual remedy is insufficient to make Plaintiff and the other Class

6  members whole and because Ford has failed and/or has refused to adequately

7  provided the promised remedies within a reasonable time.

8       237.  Accordingly, recovery by Plaintiff and the other Class members is not

9  limited to the limited warranty of repair to parts defective in materials and

10  workmanship, and Plaintiff, individually and on behalf of the other Class members,

11  seeks all remedies as allowed by law.

12       238.  Also, as alleged in more detail herein, at the time that Ford warranted

13  and sold the Class Vehicles it knew that the Class Vehicles did not conform to the

14  warranty and were inherently defective, and Ford improperly concealed material

15  facts regarding its Class Vehicles.  Plaintiff and the other Class members were

16  therefore induced to purchase or lease the Ford Vehicles under false pretenses.

17       239.  Moreover, much of the damage flowing from the Class Vehicles

18  cannot be resolved through the limited remedy of repairs, as those incidental and

19  consequential damages have already been suffered due to Ford's improper conduct

20  as alleged herein, and due to its failure and/or continued failure to provide such

21  limited remedy within a reasonable time, and any limitation on Plaintiff and the

22  other Class members' remedies would be insufficient to make them whole.

23       240.  As a direct and proximate result of Ford's breach of its express

24  warranty, Plaintiff and the other Class members have been damaged in an amount

25  to be determined at trial.

26

27

28

## COUNT 13

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### Ala. Code §§ 7-2-314 and 7-2A-212

241.   Plaintiff Cowen ("Plaintiff," for purposes of the Alabama Class's claims) repeats and realleges paragraphs 1-94 as if fully set forth herein.

242.   Plaintiff brings this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

243.   Ford is and was at all relevant times a merchant with respect to motor vehicles under Ala. Code §§ 7-2-104 and 7-2A-103.

244.   Pursuant to Ala. Code §§ 7-2-314 and 7-2A-212, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were sold and leased subject to an implied warranty of merchantability.

245.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the Throttle Defect which causes stall events and "limp home" engine throttle settings.

246.   Plaintiff Aviles, individually and on behalf of the other Class members, notified Ford of the Throttle Defect, and its corresponding breach of warranties, through a notice letter dated December 14, 2016, and delivered by Federal Express to Ford Motor Company in Dearborn, Michigan.  Ford was also provided notice of the Throttle Defect through numerous complaints that it received directly and through its dealers, as well as its own internal engineering knowledge. Ford has not taken any measures to cure its warranty breaches to Plaintiffs and the other Class members.

247.   Plaintiff and the other Class members suffered injuries due to the defective nature of the Class Vehicles and Ford's breach of the implied warranty of

1    merchantability.

2        248.   As a direct and proximate result of Ford's breach of the implied

3    warranty of merchantability, Plaintiff and the other Class members have been

4    damaged in an amount to be proven at trial.

5                              **COUNT 14**

6                        **FRAUDULENT OMISSION**

7        249.   Plaintiff Cowen ("Plaintiff," for purposes of the Alabama Class's

8    claims) repeats and realleges paragraphs 1-94 as if fully set forth herein.

9        250.   Plaintiff brings this Count individually and on behalf of the other

10   members of the Alabama Class (the "Class," for purposes of this Count).

11       251.   Ford was aware of the Throttle Defect within the Class Vehicles when

12   it marketed and sold the Class Vehicles to Plaintiffs and the other members of the

13   Class.

14       252.   Having been aware of the Throttle Defect within the Class Vehicles,

15   and having known that Plaintiff and the other members of the Class could not have

16   reasonably been expected to know of the Throttle Defect, Ford had a duty to

17   disclose the defect to Plaintiff and the other members of the Class in connection

18   with the sale or lease of the Class Vehicles.

19       253.   Ford did not disclose the Throttle Defect within the Class Vehicles to

20   Plaintiff and the other members of the Class in connection with the sale or lease of

21   the Class Vehicles.

22       254.   For the reasons set forth above, the Throttle Defect within the Class

23   Vehicles comprises material information with respect to the sale or lease of the

24   Class Vehicles.

25       255.   In purchasing and leasing the Class Vehicles, Plaintiff and the other

26   members of the Class reasonably relied on Ford to disclose known material defects

27   with respect to the Class Vehicles.

28       256.   Had Plaintiff and the other members of the Class known of the

1   Throttle Defect within the Class Vehicles, they would have not purchased or leased

2   the Class Vehicles, or would have paid less for the Class Vehicles.

3       257.   Through its omissions regarding the Throttle Defect within the Class

4   Vehicles, Ford intended to induce, and did induce, Plaintiff and the other members

5   of the Class to either purchase or lease a Class Vehicle that they otherwise would

6   not have purchased, or pay more for a Class Vehicle than they otherwise would

7   have paid.

8       258.   As a direct and proximate result of Ford's omissions, Plaintiff and the

9   other members of the Class either overpaid for the Class Vehicles or would not

10  have purchased the Class Vehicles at all if the Throttle Defect had been disclosed to

11  them, and, therefore, have incurred damages in an amount to be determined at trial.

12                              **COUNT 15**

13                          **UNJUST ENRICHMENT**

14      259.   Plaintiff Cowen ("Plaintiff," for purposes of the Alabama Class's

15  claims) repeats and realleges paragraphs 1-94 as if fully set forth herein.

16      260.   Plaintiff brings this Count individually and on behalf of the other

17  members of the Alabama Class (the "Class," for purposes of this Count).

18      261.   Ford has benefitted from selling and leasing at an unjust profit

19  defective Class Vehicles that had artificially inflated prices due to Ford's

20  concealment of the Throttle Defect, and Plaintiff and the other members of the

21  Class have overpaid for these vehicles.

22      262.   Ford has received and retained unjust benefits from Plaintiff and the

23  other members of the Class, and inequity has resulted.

24      263.   It is inequitable and unconscionable for Ford to retain these benefits.

25      264.   Because Ford concealed its fraud and deception, Plaintiff and the other

26  members of the Class were not aware of the true facts concerning the Class

27  Vehicles and did not benefit from Ford's misconduct.

28      265.   Ford knowingly accepted the unjust benefits of its wrongful conduct.

266.    As a result of Ford's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

## VIII.  <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs, individually and on behalf of the other members of the Nationwide and the Statewide Classes that they respectively seek to represent, respectfully request that the Court enter judgment in their favor and against Defendant Ford Motor Company, as follows:

a.    Declare that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more Classes as defined above;

b.    Appoint Plaintiffs as the representatives of the Classes and their counsel as Class counsel;

c.    Award Plaintiffs and Class members actual damages sustained;

d.    Award Plaintiffs and Class members such additional damages over and above the amount of their actual damages, such as punitive and statutory damages, that are authorized and warranted by law;

e.    Grant restitution to Plaintiffs and the other Class members and require Defendants to disgorge inequitable gains;

f.    Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Ford to repair, recall, and/or replace the Class Vehicles;

g.    Award Plaintiffs and the other Class members both pre- and post-judgment interest on any amounts awarded;

h.    Award Plaintiffs and the other Class members their reasonable attorneys' fees and reimbursement of all costs for the prosecution of this action; and

i.    Award such other relief as this Court deems just and appropriate.

## IX.    **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.


DATED:  February 15, 2017

_____

David S. Stellings

David S. Stellings (*pro hac vice* to be filed)
Jason L. Lichtman (*pro hac vice* to be filed)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY  10013
Telephone:  (212) 355-9500
dstellings@lchb.com
jlichtman@lchb.com

Fabrice Vincent (State Bar No. 160780)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone:  (415) 956-1000
fvincent@lchb.com

Andrew R. Kaufman (*pro hac vice* to be filed)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
150 Fourth Avenue North, Suite 1650
Nashville, TN  37212
Telephone:  (615) 313-9000
akaufman@lchb.com

1

2

W. Daniel "Dee" Miles, III (*pro hac vice* motion to be filed)

3

H. Clay Barnett, III (*pro hac vice* motion to be filed)

4

Archie I. Grubb, II (*pro hac vice* motion to be filed)

5

6

Andrew E. Brashier (*pro hac vice* motion to be filed)

7

BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.

8

272 Commerce Street
Montgomery, AL 36104

9

Telephone: (334) 269-2343

10

Dee.Miles@Beasleyallen.com
Clay.Barnett@BeasleyAllen.com

11

Archie.Grubb@Beasleyallen.com

12

Andrew.Brashier@Beasleyallen.com

13

14

Anthony J. Garcia (*pro hac vice* motion to be filed)

15

AG LAW
742 South Village Circle

16

Tampa, FL 33606
Telephone: (813) 259-9555

17

anthony@aglawinc.com

18

19

*Attorneys for Plaintiffs*

20

21

22

23

24

25

26

27

28